# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, GENERAL COMMITTEE OF ADJUSTMENT, CENTRAL CONFERENCE, ) ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case No. 11 C 7392 |
| UNION PACIFIC RAILROAD COMPANY ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An arbitrator issued an award in favor of Union Pacific Railroad Company (UP) in a union contract dispute with the Brotherhood of Locomotive Engineers and Trainmen (BLET). BLET has sued to overturn the award. Both parties have moved for summary judgment. For the reasons stated below, the Court grants UP's motion for summary judgment and denies BLET's motion.

## Background

In 1952, the Missouri Pacific Railroad Company entered into a Laying Off and Leave of Absence Agreement with two unions. That agreement binds the parties in this case as successors to the railroad and unions. The agreement has six sections, the first of which states that "[w]hen employees in engine service are permitted to lay off they must not be absent in excess of 30 days, except in case of sickness or injury, without having formal leave, in writing, granted in accordance with the provisions of this

agreement." Pl. Ex. A. In this context, laying off refers to railroad employees taking leave.

In 2004, UP unilaterally adopted a Train Engineer and Yardman Attendance Policy. As amended in 2006, it states in part:

> As a Union Pacific employee, you were hired for and are expected to protect your job assignment on a full-time basis. "Full-time" means being available to work your assignment, whether regular or extra, whenever it is scheduled to work. Assigned rest days, layover days, and agreement-provided compensated days off are available to you for personal business. In addition, reasonable personal lay-offs may be granted if the needs of service permit.
> It is your responsibility to notify your manager, in advance of layoffs [sic] if possible, on personal or family issues that may affect your ability to work full time. Substantiating documentation is expected and may be required. However, notification and documentation alone do not excuse your responsibility to protect your job. You may be considered in violation of this policy regardless of the explanation offered if you are unable to work full time and protect all employment obligations.

Pl. Ex. G at 1. The policy further states that employees who are not working full-time will be identified by looking for employees who frequently take weekend, holiday, or personal lay offs, who frequently take sickness lay offs without documentation, who are not available as often as their peer employees, and who fail to show up for work assignments. The policy states that UP will investigate these employees and discipline them if warranted. An employee's first two violations of the policy result in no discipline beyond a formal warning, but a third violation within a set period of time results in termination of the employee.

In unrelated litigation regarding UP's compliance with the Family and Medical Leave Act (FMLA), BLET contended that UP had repudiated the 1952 agreement by instituting the attendance policy. BLET argued that the 1952 agreement provided that

employees had a right to lay off whenever the service was protected, when there were enough engineers on call to meet the needs of the railroad. It also contended that before laying off, employees received permission to lay off from the crew caller, the employee who contacted engineers and assigned them to jobs and that UP could not later determine that those engineers who had been permitted to lay off had violated its attendance policy.

The parties agreed to have a single arbitrator serve as a Special Board of Adjustment under the Railway Labor Act (RLA) to determine whether the 1952 agreement and the attendance policy conflicted. *See* 45 U.S.C. § 153 First (I) & Second. The arbitrator issued an award on March 15, 2011. The arbitrator first recognized that railroad engineers often worked many hours in difficult jobs and that the federal government had acted to prevent accidents arising from engineer fatigue. He also recognized, however, that employers have a legitimate interest in preventing excessive absenteeism. He stated that management had the right "to implement policies to control excessive absenteeism, unless there is a negotiated contractual provision limiting that basic right in specific written terms." Pl. Ex. H at 25.

The arbitrator then considered the attendance policy. He noted that UP had stated the following regarding the policy:

> On its face, therefore, the Attendance Policy is *not* designed to punish or prohibit occasional absences. It is not a violation of the Policy to lay off sick, or even to lay off on a weekend or holiday. Nor is it a violation of the Policy for an employee to be absent on a recurring basis, so long as he or she provides adequate justification for the absences. It is only employees who are repeatedly or regularly absent without cause or who otherwise abuse the lay off process that run afoul of the Policy. It is, in other words, a policy designed to prohibit only *excessive* absenteeism, not all absenteeism across the board.

*Id.* at 27 (emphasis in original; internal quotation marks omitted). The arbitrator "memorialized" this statement and noted that BLET could use the statement to defend its members if they were unfairly charged with violation of the policy. He also stated that, according to UP's own statement, the policy did not require employees to be available 100% of the time, as BLET had argued.

The arbitrator then addressed whether the 1952 agreement had expressly limited the right of UP to take actions to control absenteeism. It interpreted the agreement as "primarily a leave of absence rule." *Id.* at 32. Five of the agreement's six sections dealt with employees who had received formal leaves of absence, and section one, the section on which BLET relied, controlled when a formal leave of absence was required. The arbitrator ruled that the agreement specifically required engineers to get permission to lay off. Even though the arbitrator found that permission had always been granted by the crew caller, he concluded that nothing in the agreement made permission automatic whenever there were sufficient engineers available to fulfill UP's needs.

The arbitrator did rule that one aspect of UP's attendance policy was impermissible. He rejected, at least in part, UP's stated intention to compare the attendance of engineers with their peers to determine who was in violation of the attendance policy. The arbitrator determined that using a measure such as a shop average was "arbitrary and unreasonable," because the average could shift over time, could vary from place to place within the company, and did not provide for notice to employees. *Id.* at 42. Accordingly, the arbitrator concluded that UP could not use such a metric when determining which employees had failed to work full time.

After issuing the award, the arbitrator made a clarification on June 10, 2011

regarding whether engineers could be punished for laying off in good faith. The arbitrator reiterated his ruling that the attendance policy did not permit UP to discipline engineers who had excessive absences but also could show just cause. For those who could not show cause, however, the arbitrator ruled that the good faith of the employee was not a factor and could not be used as a defense to discipline.

## Discussion

"In keeping with the purpose of the RLA—that is, to resolve railway labor disputes in an efficient man[ner]—the jurisdiction of the federal courts is limited to only the narrowest review of [the] arbitrators' decisions." *Bhd. of Locomotive Eng'rs v. Union Pac. R.R. Co.*, 522 F.3d 746, 750 (7th Cir. 2008). "Under the RLA, federal courts may review a Board's decision only when (1) the Board has failed to comply with the requirements of the RLA; (2) the Board has failed to conform or confine itself to matters within the scope of its jurisdiction; and (3) the Board or one of its members has engaged in fraud or corruption." *Id.*; see 45 U.S.C. § 153 First (q). The Supreme Court has also held that an arbitrator's decision may be unenforceable in court if it is contrary to an "explicit, well defined, and dominant" public policy. *E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62 (2000) (internal quotation marks omitted); see *United Food & Commercial Workers v. Illinois-American Water Co.*, 569 F.3d 750, 754 n.3 (7th Cir. 2009) (standard for reviewing arbitration decisions is the same under RLA, Taft-Hartley Act, and Federal Arbitration Act).

BLET's complaint includes four counts, but the parties agree that BLET advances two arguments for vacating the arbitration award, with the first three counts all directed at the first argument. First, BLET contends that the arbitrator exceeded his jurisdiction,

5

and second, it contends that the award violates public policy.

## A. Scope of arbitrator's jurisdiction

BLET contends that the arbitrator exceeded his jurisdiction because his award was not based on the contract but instead was based on recognition of and deference to UP's managerial rights. "To remain within the scope of its jurisdiction, the essence of the [arbitrator]'s decision must be contained in the terms of the agreement between the union and the employer. In other words, the [arbitrator]'s decision must be based on the provisions of the [contract]." *Lyons v. Norfolk & W. Ry.*, 163 F.3d 466, 469 (7th Cir. 1999) (citations omitted). The scope of the Court's review is very narrow:

> [T]he question before a federal court is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. An arbitration award . . . may be overturned only if the reviewing court is convinced that the arbitrator was not trying to interpreting the collective bargaining contract, but that instead he resolved the parties' disputes according to his private notions of justice.

*Bhd. of Locomotive Eng'rs*, 522 F.3d at 757 (citations, brackets, and internal quotation marks omitted).

In this case, BLET concedes that the arbitrator spent "a substantial portion of [his] opinion grappling with the language in paragraph 1 of the Agreement." Indeed, the arbitrator concluded that the 1952 agreement primarily concerned when formal leaves of absence were required. Pl. Ex. H at 32. He also ruled that the fact that the agreement referred to employees being permitted to lay off meant that employees had to receive permission before laying off, and thus the agreement preserved management's right to determine when laying off was appropriate. *Id.* at 36–37. The

arbitrator recognized BLET's contention that when the agreement referred to occasions when employees were "permitted" to lay off it meant "when conditions permit," and that UP could not deny permission or later discipline employees for laying off when there were adequate engineers for UP's service needs. The arbitrator rejected that interpretation, however, in favor of interpreting permission to mean "when permission is given." *Id.* at 37. The Court concludes, based on the arbitrator's ruling, that he in fact interpreted the contract. As a result, he did not exceed his jurisdiction. *See Lyons*, 163 F.3d at 469.

BLET contends that "[t]here are cases where although the arbitrator does not *say* that his award is noncontractual . . . there is no possible interpretive route to the award, so a noncontractual basis can be inferred and the award set aside." *Chicago Typographical Union No. 16 v. Chicago Sun-Times*, 935 F.2d 1501, 1506 (7th Cir. 1991) (emphasis in original). BLET does not, however, explain how it is that there is no possible interpretative route between the 1952 agreement and the arbitrator's decision. The Court concludes that there is such a route. Specifically, the arbitrator ruled that the 1952 agreement contemplated employees receiving permission to lay off and did not require UP to grant such permission whenever there were sufficient engineers for its service needs. In short, the arbitrator held that the agreement did not prevent UP from imposing an attendance policy. This is a "possible interpretive route" to the award, even if reasonable minds could differ regarding its accuracy.

BLET argues that the arbitrator's decision interprets the word permitted in the 1952 agreement inconsistently. It notes that the arbitrator found that engineers sought permission to lay off from the crew caller, who gave permission in every single instance.

7

Pl. Ex. H at 36–37.  According to BLET, the arbitrator did not reconcile this with the fact that his award allows UP to discipline engineers who had received permission to lay off. *Id.* at 37–38.  BLET argues that the arbitrator inconsistently interpreted the reference to permission in the 1952 agreement to refer both to permission given by the crew caller before an engineer took leave and permission as determined by UP when enforcing its attendance policy after an engineer took leave.

As an initial matter, even if the arbitrator interpreted the reference to permission to mean two different things, the award cannot be vacated.  Specifically, even if the interpretation was a gross error, the Court cannot overturn it because the arbitrator did in fact interpret the contractual term.  *Bhd. of Locomotive Eng'rs*, 522 F.3d at 757; *see Chicago Typographical Union*, 935 F.2d at 1506 (countless decisions have determined that an arbitrator's award need not be a reasonable interpretation of the contract).  In any event, in dealing with the motion for clarification, the arbitrator explained his potentially inconsistent interpretation of the term permitted.  He explained that "there are numerous precedent arbitration decisions . . . where discipline or discharge is considered consistent with just cause when based on pattern or frequency, wholly apart from the cause of the absences."  Pl. Ex. I at 5.  In other words, the arbitrator ruled that although an engineer may have had permission to lay off on a given day when looking only at that day, UP could later discipline the engineer for laying off when considering the entire pattern of his absences.  The crew caller could not consider such a pattern while deciding on a specific lay off, particularly because he could not contemplate the engineer's future lay offs.  Thus, the arbitrator stated, the word permitted in the 1952 agreement referred in part to UP's "reserved judgment" and allowed UP to respond with

8

discipline.  Pl. Ex. H at 37–38.

BLET believes that the arbitrator should have interpreted the 1952 agreement to read something like this:  "[w]hen employees in engine service are permitted to lay off *by the crew caller because there are sufficient engineers to fulfill UP's needs,* they must not be absent in excess of 30 days, except in case of sickness or injury, without having formal leave, in writing, granted in accordance with the provisions of this agreement, *and there must be no further discipline or repercussions*."  Although that might be a permissible interpretation of the 1952 agreement, the Court cannot vacate the arbitrator's award for failing to adopt that particular interpretation.  The arbitrator ruled that nothing in the 1952 agreement specified the form that permission for laying off would take or prevented UP from instituting a separate attendance policy that would examine engineers' laying-off histories after the fact.

BLET also contends that the arbitrator did not base his award on the contract but instead dispensed "his own brand of industrial justice."  *United Food & Commercial Workers*, 569 F.3d at 755 (internal quotation marks omitted).  It notes that the arbitrator considered UP's interests, saying that "the Carrier needs to be assured there is a sufficient number of engineers to operate its trains, but not so many that it is required to pay excessive health and welfare costs" and that "[t]he Carrier . . . has legitimate concerns about employees who are excessively absent."  Pl. Ex. H at 25–26.  The arbitrator also justified his decision by stating that "the right of employers to discipline employees for excessive absenteeism has long been recognized by arbitral panels." *Id.* at 34. BLET argues that these statements show that the award was based more on consideration of UP's interests than on the language of the contract.

BLET's argument, however, disregards the fact that the arbitrator interpreted the 1952 agreement. As discussed above, the arbitrator concluded that the agreement did not require UP to give permission for lay offs when there were enough engineers for its service needs and did not prevent UP from creating a separate attendance policy. Having thus interpreted the contract, the arbitrator concluded that there was nothing to prevent UP from exercising the management authority that the arbitrator recognized it possessed. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 (1960) (management can freely exercise its authority when not limited by collective bargaining agreement); *Chicago & N. W. Transp. Co. v. Ry. Labor Execs. Assoc.*, 908 F.2d 144, 153 (7th Cir. 1990) ("what the agreements do not forbid, either explicitly or implicitly . . . , the railroad is allowed to do as a matter of contract"). He stated that "[t]he Carrier has an inherent right to control the attendance of its employees, and that right was not clearly ceded in the 1952 Agreement." Pl. Ex. H at 41. The arbitrator's interpretation of the 1952 agreement was based on the language of that contract. His discussion of UP's managerial rights only served to illustrate what UP had not given up via the contract.

Furthermore, "though the arbitrator's decision must draw its essence from the agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem." *United Paperworkers Intern. Union v. Misco, Inc.*, 484 U.S. 29, 41 (1987); *see Bhd. of Locomotive Eng'rs*, 522 F.3d at 754–55 (arbitrators can consider past awards, but are not bound by them); *Chicago Newspaper Publishers' Assoc. v. Chicago Web Printing Pressmen's Union No. 7*, 821 F.2d 390, 396–97 (7th Cir. 1987) ("parties to collective bargaining agreements expect labor arbitrators to use their

expertise and look to such sources as the law of the shop and prior practices in interpreting contracts"). The arbitrator interpreted the contract, and thus the award draws its essence from the contract. Having done that, he was permitted to consider the interests of the parties, as well as practices in the industry as represented by other awards and the law of the shop. *See Bhd. of Locomotive Eng'rs v. Union Pacific R.R. Co.*, No. 10 C 6661, 2011 WL 5828129, at *4–5 (N.D. Ill. Nov. 18, 2011).

BLET contends that the arbitrator's decision is inconsistent with an award made by Referee Twomey in 1992. Pl. Ex. F. There, a UP superintendent required an employee to be available to work at least eighty percent of the time during any sixty-one day period. *Id.* at 3. Although the referee's award recognized that "the Carrier has the right to insist that employees be full time employees," the referee ruled that the eighty percent requirement was barred by the 1952 agreement. *Id.* at 3–4. The referee found that the agreement specifically contemplated the possibility of engineers laying off for thirty days at a time, a lay off that would violate the superintendent's eighty percent requirement because the employee would be absent for thirty days in a sixty-one day period. *Id.* at 4. BLET contends that the current award is inconsistent with the Twomey award, because the Twomey award invalidated a UP policy that was less restrictive and recognized that the 1952 agreement barred at least some attendance policies.

The question of what the Twomey award means, however, is a matter for the arbitrator to decide, not the Court. The RLA provides that interpretation of awards is a matter for arbitration, because any interpretation of the award is effectively an interpretation of the underlying collective bargaining agreement. 45 U.S.C. § 153 First (m); *Bhd. of Maintenance of Way Emps. v. Burlington N. R.R. Co.*, 24 F.3d 937, 938–39

11

(7th Cir. 1994). Furthermore, "[a]rbitrators can and do consider the language of other awards in determining the outcome of matters before them, but they are not bound by the outcome of prior decisions in the same way that judges are bound by the doctrine of *stare decisis* in courts." *Bhd. of Locomotive Eng'rs*, 522 F.3d at 754–55 (emphasis in original). In any event, the arbitrator interpreted the Twomey award, despite its specific holding, as recognizing that UP had the "right to take corrective action when employees are deemed to be excessively absent or otherwise abuse the layoff privileges." Pl. Ex. H at 31. He also stated that the Twomey award did not forbid UP from adopting an attendance policy or require UP to permit all lay offs if there were an adequate number of engineers for its service needs. *Id.* at 31–32. The arbitrator also distinguished the Twomey award on the ground that UP's current attendance policy "does not set any specific attendance standard, *per se*." *Id.* at 28.

Finally, BLET argues in a footnote that the arbitrator's award fails to draw its essence from the contract because the arbitrator did not address BLET's argument based on a different contractual agreement. In the Guaranteed Extra Board Agreement, BLET and UP agreed that "[s]ufficient employees shall be maintained to permit reasonable layoff privileges for regular employees." Pl. Ex. B at 1. The arbitrator did not specifically mention the Guaranteed Extra Board Agreement in his award. The arbitrator did, however, rule that UP's attendance policy was designed to discipline only "employees who are repeatedly or regularly absent without cause or who otherwise abuse the lay off process." Pl. Ex. H at 27 (internal quotation marks omitted).

The failure of the arbitrator to address or explain why he rejected BLET's argument premised on the Guaranteed Extra Board Agreement does not require the

12

Court to vacate the award. *Chicago Typographical Union*, 935 F.2d at 1505–06 (arbitrator who simply said that a particular section of the contract was inapplicable without explanation was permissible, because there was nothing to indicate that arbitrator disregarded the section and imposed his own policy preferences); *see Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 564 (7th Cir. 2008) ("the arbitrator did not exceed his power by not explaining his award in greater detail"). As BLET notes, the arbitrator failed to expressly address its argument. Because, however, an "arbitrator's interpretations must be accepted even when erroneous, it cannot be correct that arbitrators are required to write good opinions." *Chicago Typographical Union*, 935 F.2d at 1506.

Furthermore, there is an "interpretive route to the award" from the language of the Guaranteed Extra Board Agreement. *Chicago Typographical Union*, 935 F.2d at 1506. As noted above, the arbitrator adopted UP's express limitation on the attendance policy, specifically that it applies only to employees who are regularly absent without cause or abused the laying-off process. The arbitrator appropriately could determine that the Guaranteed Extra Board Agreement's implicit allowance of "reasonable layoff privileges" is not contrary to the limited scope of the attendance policy, which punishes only those who did not have cause for their pattern of laying off.

**B.     Public policy**

BLET contends that even if the arbitrator did not exceed his jurisdiction in interpreting the contract and fashioning an award, the award is unenforceable because it violates public policy. "[A]ny such public policy must be explicit, well defined, and dominant. It must be ascertained by reference to the laws and legal precedents and not

13

from general considerations of supposed public interests." *E. Associated Coal Corp.*, 531 U.S. at 62 (citation and internal quotation marks omitted).

BLET argues that there is a public policy in favor of railroad safety and in particular in favor of allowing railroad engineers to refuse to work when working would be dangerous. It notes that the Federal Railroad Safety Act (FRSA) forbids retaliation against employees who report hazardous conditions or refuse to work when confronted by hazardous conditions. 49 U.S.C. § 20109(b). Federal law also requires railroads to develop plans to reduce the risks from employee fatigue and prescribes the maximum hours that railroad employees may work. *Id.* §§ 20156(f) & 21103. BLET contends that UP's attendance policy can be used to punish employees who are too sick or injured to work safely and thus violates the public policy established by these federal statutes.

Even if the statutes cited by BLET establish an explicit and well-defined public policy, BLET cannot extend that policy to bar all employee discipline policies under which a railroad might take actions that in some instances might run afoul of the public policy. *See E. Associated Coal Corp.*, 531 U.S. at 63 ("where two political branches have created a detailed regulatory regime in a specific field, courts should approach with particular caution pleas to divine further public policy in that area"); *see also Pan Am. Airways Corp. v. Air Line Pilots Ass'n, Int'l*, 206 F. Supp. 2d 12, 24–25 (D.D.C. 2002) (rejecting public policy challenge to award ordering reinstatement when employer could not cite any provision in detailed regulatory scheme for airlines that would forbid reinstatement). In considering whether to refuse to enforce an arbitration award based on public policy, the question for the court is not whether any underlying actions by the parties violated public policy, but whether the specific actions ordered by the award do

14

so. *E. Associated Coal Corp.*, 531 U.S. at 62–63 (question was not whether employee drug use violated public policy, but whether award requiring reinstatement of employee who had used drugs did); *see W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766–69 (1983) (company laid off men in violation of collective bargaining agreement's seniority provision pursuant to conciliation agreement entered into after discrimination law suit; enforcement of arbitration award requiring back pay to the men did not violate public policy even though it created an incentive to repudiate conciliation agreement); *United Food & Commercial Workers Union v. St. John's Mercy Health Sys.*, No. 4:04CV480CDP, 2005 WL 2333922, at *10 (E.D. Mo. Sept. 22, 2005) (rejecting public policy challenge to award ordering the termination of many nurses at hospital, because state law did not specify a certain ratio of nurses as necessary for patient care).

Nothing in the arbitration award at issue here requires the railroad to violate public policy by disciplining employees who are too sick or injured to work. At most, the reading of the attendance policy that BLET adopts in its briefs would "allow[ ] for discipline against the employees who lay off, even if they are sick or injured, and even if they provide substantiating documentation." Pl. Br. at 15. This reading of the attendance policy, however, would not *require UP* to discipline employees who refuse to work because they were too injured or sick to work safely. If UP attempted to do so, the employees would have the right to bring a complaint before the Secretary of Labor. 49 U.S.C. § 20109(d). The same statute that BLET relies on to show a public policy in favor of permitting employees to refuse to work when working would be dangerous gives employees a right to bring an administrative action before the Secretary. *Id.* § 20109(b) & (d). Employees who prevail can be reinstated if they were terminated and

15

receive backpay, compensatory and punitive damages, and attorney's fees. *Id.* § 20109(e).

In any event, the arbitrator did not adopt the expansive interpretation of the attendance policy that BLET contends could violate public policy. The arbitrator adopted UP's limitations on the policy, in particular that "[i]t is not a violation of the Policy to lay off sick . . . . It is only employees who are repeatedly or regularly absent without cause or who otherwise abuse the lay off process that run afoul of the Policy." Pl. Ex. H at 27. The arbitrator later reiterated that "[t]he Carrier has . . . agreed that the [policy] does not prohibit employees from laying off due to sickness or injury." *Id.* at 34. According to UP's own concessions, as memorialized by the arbitrator, a worker does not violate the policy for laying off because he is sick or injured. In his response to the motion for clarification, the arbitrator held that employees with cause for their absenteeism could not be punished under the attendance policy, and he specifically mentioned "illness or injury" as examples of cause. Pl. Ex. I at 5, 8.

Although UP reserved the right to require documentation from sick or injured workers and to discipline "excessive or pattern absenteeism," Pl. Ex. H at 34, the scope of the policy is far narrower than BLET suggests and does not permit UP to discipline workers merely because they lay off when sick or injured, let alone when so sick or injured that for them to attempt to work would cause a dangerous condition of the sort contemplated by section 20109. *See* 49 U.S.C. § 20109(b)(2)(B) (hazardous condition must be such that a reasonable individual would conclude there is an imminent danger of death or serious injury).

BLET cites two administrative cases from the Department of Labor which it

16

argues support the public policy it seeks to enforce.  Each of the cases, however, is distinguishable.  *Bala v. Port Authority Trans-Hudson Corp.*, 2010-FRS-26 (Dep't of Labor Feb. 10, 2012) (Pl. Ex. 2), involves a complaint under section 20109 of the FRSA.  Bala was disciplined for violating his employer's attendance policy even though his doctor had ordered him not to work.  *Id.* at 8–9.  The administrative law judge (ALJ) concluded that the employer had violated an express provision of the FRSA that protects workers from discipline if they are following a doctor's orders.  *Id.* at 9–14; *see* 49 U.S.C. § 20109(c)(2).  This case establishes that workers have a remedy when their rights under section 20109 are violated.  The ALJ did not, however, invalidate the employer's entire attendance policy merely because it was used once in a way that violated federal law.

The other case, *Furland v. Am. Airlines, Inc.*, 2008-AIR-11 (Dep't of Labor Admin. Review Bd. July 27, 2011) (Pl. Ex. 3), is likewise distinguishable.  There, the Review Board held that a pilot could refuse to work when he was sick, if his sickness presented a legitimate safety concern under the relevant air safety statute.  *Id.* at 7–8.  The Board also held that the employer's request for supporting documentation for the illness could be retaliatory, when the pilot had no notice that such documentation might be requested.  *Id.* at 9–10.  The Board expressly noted "that employers have a compelling business interest in requiring proof that their employees' absences based on illness are legitimate" and recognized that company policies would be an appropriate way to provide notice to the employee that documentation was required.  *Id.* at 9.  In the current case, as discussed above, the attendance policy does not discipline employees who lay off for sickness or injury but rather puts employees on notice that they may

17

have to provide appropriate documentation.  Pl. Ex. G at 1.

BLET contends that the arbitration in this case was initiated because UP commenced disciplinary proceedings against many engineers under the attendance policy, many of which involved employees laying off for illness and injury.  BLET concedes, however, that the arbitrator did not make any findings regarding the reasons that the engineers involved in these proceedings had laid off, and it does not suggest that the Court can appropriately make such findings.  *See Lyons v. Norfolk & W. Ry.*, 163 F.3d 466 n.1 (7th Cir. 1999) (courts have no authority to review arbitrator's findings of fact).  Nor has BLET presented any evidence to this Court to support its claim that many engineers face discipline because they laid off due to sickness or injury.  Irrespective of BLET's assertions or the reasons why UP may have initiated discipline against any engineer, during the arbitration UP specifically conceded that the policy did not apply to laying off for sickness or injury, and the arbitrator adopted this concession.  Pl. Ex. H at 34.  Should UP attempt to discipline engineers who are not "repeatedly absent without cause or who [do not] otherwise abuse the lay off process," its actions would violate the award.  *Id.* at 27.  In addition, any public policy threatened by UP's actions in particular cases remains protected by the employees' FRSA rights and remedies and, as the arbitrator noted, their FMLA rights and remedies.  *Id.* at 34.

BLET contends that UP's attendance policy may dissuade employees from laying off when they are sick or injured because they fear discipline and thus violate public policy.  As discussed above, any public policy embodied in the FRSA should not be stretched further than the statutory scheme enacted by that statute.  *See E. Associated Coal Corp.*, 531 U.S. at 63.  Furthermore, the arbitrator's award, not to mention the

express statutory protections of section 20109, make it clear that employees cannot be disciplined for refusing to work when they are so sick or injured that working would be dangerous.

## Conclusion

For the reasons stated above, the Court grants defendant's motion for summary judgment [docket no. 23] and denies plaintiff's motion for summary judgment [docket no. 20-1]. The Court directs the Clerk to enter judgment in favor of defendant.

```
                                    _____
                                          MATTHEW F. KENNELLY
                                          United States District Judge
```

Date: July 30, 2012